[Cite as *Brecksville-Broadview Hts. Bd. of Edn. v. Cuyahoga Cty. Bd. of Revision*, 2016-Ohio-3166.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 103015**

# BRECKSVILLE-BROADVIEW HEIGHTS BOARD OF EDUCATION, ET AL.

APPELLEES

vs.

# CUYAHOGA COUNTY BOARD OF REVISION, ET AL.

APPELLEES

[Appeal By: TMMC OHIO, L.L.C.]

**JUDGMENT:**
AFFIRMED

Administrative Appeal from the
Ohio Board of Tax Appeals
Case No. 2014–986

**BEFORE:** E.A. Gallagher, J., Keough, P.J. and McCormack, J.
**RELEASED AND JOURNALIZED:** May 26, 2016

**ATTORNEYS FOR APPELLANT**

William J. Day
Joseph A. Balbier
9100 South Hills Blvd., Suite 325
Broadview Heights, Ohio 44147

**ATTORNEY FOR APPELLEE**
**BRECKSVILLE-BROADVIEW HEIGHTS BOARD OF EDUCATION**

William E. Blackie III
Fisher & Phillips LLP
9150 South Hills Blvd., Suite 300
Broadview Heights, Ohio 44147

**ATTORNEYS FOR APPELLEE CUYAHOGA COUNTY BOARD OF REVISION**

Timothy J. McGinty
Cuyahoga County Prosecutor
BY: Reno J. Oradini
Assistant Prosecuting Attorney
The Justice Center, 8th Floor
1200 Ontario Street
Cleveland, Ohio 44113

**ATTORNEY FOR APPELLEE OHIO TAX COMMISSIONER**

Mike DeWine
Ohio Attorney General
30 East Broad Street
Columbus, Ohio 43215

EILEEN A. GALLAGHER, J.:

{¶1} Appellant TMMC Ohio, L.L.C. ("TMMC") appeals from a decision of the Board of Tax Appeals reversing the Cuyahoga County Board of Revision's ("BOR") valuation, for tax purposes, of a parcel of vacant commercial property owned by TMMC and reinstating the higher valuation of the property assessed by the Cuyahoga County Fiscal Officer (the "Fiscal Officer"). For the reasons that follow, we affirm the decision of the Ohio Board of Tax Appeals ("BTA").

**Factual and Procedural Background**

{¶2} In February 2013, TMMC filed a complaint against the valuation of a 4.65 acre parcel of vacant commercial land located at 6250 Broadview Road, Broadview Heights, in Cuyahoga County (the "subject property"), seeking a reduction in the valuation of the property for tax year 2012. The Fiscal Officer had assigned a total value of $729,200 to the subject property. TMMC had been the highest bidder for the property at a public, absolute auction[1] held in March 2012 and sought a reduction in the property's total true value for tax purposes to $368,500, the price it paid for the property in May 2012. Appellee, the Brecksville-Broadview Heights Board of Education ("Board of Education"), filed a counter-complaint seeking to maintain the Fiscal Officer's valuation

---

[1]An absolute auction is an auction where the sale is awarded to the highest bidder; there is no reserve that sets a minimum required bid for the item to be sold.

of the property, asserting that "[r]ecent record sales, economic evidence and other evidence that will be presented at hearing" supported the Fiscal Officer's valuation.

**{¶3}** In February 2014, the BOR held a hearing on the complaint and counter-complaint. At the hearing, Anthony Ciocca, one of the members of TMMC,[2] testified regarding TMMC's purchase of the subject property. He testified that he learned the property was to be sold at auction when he saw a sign posted on the property, approximately six months prior to the March 2012 auction date. The sign, a copy of which was introduced at the hearing, indicated that the property was being "OFFERED ABSOLUTE, REGARDLESS OF PRICE!" Ciocca stated that the sign referenced a website, which provided additional information regarding the sale. Ciocca testified that the auction was held at the Holiday Inn on Rockside Road in Independence, Ohio, that the subject property was one of several properties for sale at the auction; and that there was "a room full of people" bidding on the subject property. He indicated that TMMC's winning bid for the property was $335,000 and that there was a 10% fee assessed, resulting in a total purchase price of $368,500.

**{¶4}** In support of TMMC's request for a reduction in the valuation of the subject property, Ciocca submitted copies of the following documents related to TMMC's purchase of the property: a "purchaser's statement" referencing the $368,500 purchase price executed by Guardian Title & Guaranty Agency, Inc. ("Guardian Title") and TMMC, a statement of conditions of acceptance of escrow executed by Guardian Title (but not

---

[2]Ciocca indicated that the other members of TMMC were his brothers, Matt and Mike Ciocca.

TMMC or the seller, Landspan Corp. ("Landspan")), a limited warranty deed for the property from Landspan to TMMC and a letter from Guardian Title to TMMC dated June 18, 2012, referencing the limited warranty deed and a title insurance policy.[3]   TMMC also submitted several lists comparing the tax valuations of what Ciocca claimed were similar neighboring properties, including several properties that had been sold at auction in 2011. The BOR rejected Ciocca's property comparisons, indicating, at the hearing, that the neighboring properties' tax values and the sales of other properties at auction did not constitute probative evidence of the tax value of the subject property.

{¶5}   With respect to what TMMC planned to do with the subject property, Ciocca claimed that TMMC "had some plans to build something on [the property]," but was concerned that, based on the current tax valuation of the property, if it developed the property, the taxes on the property would increase to such a level that "you're not going to be competitive."   He stated that "we have some opportunity here" but "we need to soften things up for me in order to make it."   He further explained, "right now I feel if we could have the taxes where we purchased it, we could take the handcuffs off, * * * get it where it needs to be    * * * more competitive" and "make something there successful."

{¶6} In response to questions by the BOR and cross-examination by the Board of Education, Ciocca stated that he knew very little about the subject property or the

---

[3] At the conclusion of the hearing, the BOR requested that TMMC submit copies of the purchase agreement and closing statement for the purchase of the property to the BOR.   Although TMMC later claimed that the "purchaser's statement" was the closing statement, there is nothing in the record that indicates that any purchase agreement was submitted.

circumstances surrounding the offer of sale of the property. He testified that he had no relationship with Landspan, the prior owner of the property, nor with the auctioneer of the property. Ciocca indicated that he did not know why the property was being sold at auction and that, other than to walk the property and to confirm no back taxes were owed on the property, he did not know "anything about the property" and did no research on the property prior to bidding on it at auction. Ciocca speculated that the prior owners, who he claimed had owned the property since 1974, had "had their taxes quite significantly increased [in 2007] because of the boom in the economy which * * * we know is no longer there" and that "they didn't want to hold the property any longer" due to the increased tax burden. Ciocca stated that "[w]e liked the property for what it looked like," that '[i]t looked like a beautiful piece of land" and that that was TMMC's "only concern" in bidding on the property.

{¶7} The Board of Education did not present any evidence at the hearing. It simply cross-examined Ciocca regarding his lack of knowledge of the circumstances that led to the sale of the property at an absolute auction.

{¶8} In February 2014, the BOR granted TMMC's request for a reduction in valuation, reducing the total true value of the property to $368,500. In its oral hearing worksheet and journal entry, the BOR indicated: "Complaintant [sic] provided testimony and evidence that indicates 2012 sales was arms [sic] length." Accordingly, the BOR "revised [the] market value to [the] sales price" of the subject property.

{¶9} The Board of Education filed an appeal with the BTA, arguing that the purchase price of the property at auction did not provide a legal basis for reducing the Fiscal Officer's valuation of the property. The parties waived a hearing and agreed that the appeal would be decided based on the statutory transcript and the parties' briefs.

{¶10} On April 13, 2014, the BTA issued its decision, reversing the BOR and reinstating the Fiscal Officer's original valuation. The BTA concluded that there was "insufficient evidence" to demonstrate that the May 2012 auction sale was an arm's-length transaction and that the BOR's reliance on the auction sale price as the basis for its determination of the true value of the subject property for tax year 2012 was, therefore, "improper." The BTA further held that "in the absence of a qualifying sale, [TMMC] was required, but failed, to provide a competent appraisal of the subject property, attested to by a qualified expert, for the tax lien date in issue" and that "the remaining evidence in the record * * * is not competent or probative of the subject [property]'s value." TMMC appealed the decision of the BTA, raising the following assignment of error for review:

> The Board of Tax Appeals ("BTA") erred by setting the subject property's true value at $729,200, and its taxable value at $255,220 (BTA Decision and Order, 20140986) in spite of the Cuyahoga County Board of Revision ("BOR") Decision relying upon competent evidence in reaching its decision.

**Law and Analysis**

{¶11} TMMC argues that the BTA erred in concluding that the May 2012 auction sale of the subject property was not an arm's-length transaction. It asserts that the auction sale price was "credible, competent and probative evidence" of the value of the subject

property and that the BTA should have "accepted" that evidence of the property's value "over the [Fiscal Officer's] valuation of the property." We disagree.

**{¶12}** This court reviews a decision of the BTA to determine only whether it is "reasonable and lawful." R.C. 5717.04; *Bd. of Edn. of the Warrensville Hts. City School Dist. v. Cuyahoga Cty. Bd. of Revision,* 145 Ohio St.3d 115, 2016-Ohio-78, 47 N.E.3d 144, ¶ 16; *Gides v. Cuyahoga Cty. Bd. of Revision*, 8th Dist. Cuyahoga No. 102649, 2015-Ohio-4385, ¶ 5. In conducting such a review, we defer to the factual findings of the BTA so long as they are supported by "reliable and probative evidence in the record." *Bd. of Edn. of the Warrensville Hts. City School Dist.* at ¶ 16*,* citing *Satullo v. Wilkins*, 111 Ohio St.3d 399, 2006-Ohio-5856, 856 N.E.2d 954, ¶ 14; *Weiler v. Cuyahoga Cty. Bd. of Revision*, 8th Dist. Cuyahoga No. 101822, 2015-Ohio-1383, ¶ 8. Any legal determinations by the BTA are, however, subject to a de novo review. *Olentangy Local Schools Bd. of Edn. v. Del. Cty. Bd. of Revision*, 141 Ohio St.3d 243, 2014-Ohio-4723, 23 N.E.3d 1086, ¶ 21, citing *Crown Communication, Inc. v. Testa*, 136 Ohio St.3d 209, 2013-Ohio-3126, 992 N.E.2d 1135, ¶ 16; *see also Bd. of Edn. of the Warrensville Hts. City School Dist.* at ¶ 16. "The party seeking the change in value bears the burden of demonstrating a valuation different from the currently assessed value." *Weiler* at ¶ 8, citing *Bd. of Edn. of the Columbus City School Dist. v. Franklin Cty. Bd. of Revision*, 90 Ohio St.3d 564, 566, 740 N.E.2d 276 (1991).

**{¶13}** Decisions of boards of revision are "'not * * * accorded a presumption of validity.'" *Vandalia-Butler City School Bd. of Edn. v. Montgomery Cty. Bd. of Revision*,

130 Ohio St.3d 291, 2011-Ohio-5078, 958 N.E.2d 131, ¶ 13, quoting *Colonial Village, Ltd. v. Washington Cty. Bd. of Revision*, 114 Ohio St.3d 493, 2007-Ohio-4641, 873 N.E.2d 298, ¶ 23; *see also Bd. of Edn. of the Vandalia-Butler City School Dist.  v. Montgomery Cty. Bd. of Revision*, 106 Ohio St.3d 157, 2005-Ohio-4385, 833 N.E.2d 271, ¶ 10 ("'[A] determination of the true value of real property by a board of revision * * * is not presumptively valid.'"), quoting *Amsdell v. Cuyahoga Cty. Bd. of Revision*, 69 Ohio St.3d 572, 574, 635 N.E.2d 11 (1994).  Where, as here, the statutory transcript is the only evidence before the BTA, the BTA must "make its own independent judgment based on its weighing of the evidence contained in the transcript."  *Columbus Bd. of Edn. v. Franklin Cty. Bd. of Revision*, 76 Ohio St.3d 13, 15, 665 N.E.2d 1098 (1996).  Thus, the issue before this court is whether the BTA acted reasonably and lawfully when it concluded that there was insufficient evidence that the May 2012 auction sale was an arm's-length transaction and, on that basis, (1) reversed the BOR's decision adopting the May 2012 auction sale price as the property's value and (2) reinstated the Fiscal Officer's original valuation of the property.

{¶14}   The "best evidence of true value" of real property is generally considered to be the actual sale price of the property in a recent arm's-length transaction, i.e.,"the price arrived at by a willing purchaser and willing seller."  *Meyer v. Cuyahoga Cty. Bd. of Revision*, 58 Ohio St.2d 328, 333, 390 N.E.2d 796 (1979); *Gides v. Cuyahoga Cty. Bd. of Revision*, 8th Dist. Cuyahoga No. 100830, 2014-Ohio-4086, ¶ 13.  As applied to the tax

year at issue, former R.C. 5713.03,[4] which sets forth how real property is to be valued for tax purposes, stated, in relevant part:

> In determining the true value of any tract, lot, or parcel of real estate under this section, if such tract, lot, or parcel has been the subject of an arm's length sale between a willing seller and a willing buyer within a reasonable length of time, either before or after the tax lien date, the auditor shall consider the sale price of such tract, lot, or parcel to be the true value for taxation purposes. * * *

Am.Sub.H.B. No. 260, 140 Ohio Laws, Part II, 2665, 2772.

**{¶15}** R.C. 5713.04, however, expressly provides that "[t]he price for which * * * real property would sell at auction or forced sale shall not be taken as the criterion of its value." The Ohio Supreme Court has interpreted R.C. 5713.04 as "establish[ing] a presumption that a sale price from an auction is not evidence of a property's value." *Olentangy*, 141 Ohio St.3d 243, 2014-Ohio-4723, 23 N.E.3d 1086, at ¶ 40. However, the presumption "may be rebutted by evidence showing that the [auction] sale occurred at arm's length between typically motivated parties." *Id.* at ¶ 2, 40 (R.C. 5713.04 "requires the taxing authorities to presume that an auction sale price is not a voluntary, arm's-length transaction" but "[t]hat presumption may be rebutted * * * by evidence that a particular

---

[4]*See Sapina v. Cuyahoga Cty. Bd. of Revision,* 136 Ohio St.3d 188, 2013-Ohio-3028, 992 N.E.2d 1117, ¶ 20, fn. 1 (courts must "apply the substantive tax law that was in effect during the tax year at issue"); *see also Olentangy Local Schools Bd. of Edn. v. Del. Cty. Bd. of Revision,* 2015-Ohio-2070, 34 N.E.3d 150, ¶ 28-39 (5th Dist.) (concluding that the H.B. 260 version of R.C. 5713.03 applied to property valuation for tax year 2012). R.C. 5713.03 was amended and now provides, in relevant part: "In determining the true value of any tract, lot, or parcel of real estate under this section, if such tract, lot, or parcel has been the subject of an arm's length sale between a willing seller and a willing buyer within a reasonable length of time, either before or after the tax lien date, the [fiscal officer] *may* consider the sale price of such tract, lot, or parcel to be the true value for taxation purposes." (Emphasis added.)

sale was in fact voluntary and did occur at arm's length."); *see also Schwartz v. Cuyahoga Cty. Bd. of Revision,* 143 Ohio St.3d 496, 2015-Ohio-3431, 39 N.E.3d 1223, ¶ 27.   R.C. 5713.04 applies regardless of whether the auction is a "voluntary auction" or an "involuntary auction," i.e., a "forced sale."   *Olentangy* at ¶ 27, 29-30.   "[I]n spite of R.C. 5713.04's proscription," when all the elements of an arm's-length transaction are present, "'the sale prices of parcels sold at auction are nevertheless the best evidence of [their] value.'"   *Id.* at ¶ 39, quoting *Concept Invest. Group L.L.C. v. Franklin Cty. Bd. of Revision*, BTA No. 2005-T-1267, 2006 Ohio Tax LEXIS 1482, *3 (Nov. 17, 2006).

{¶16}   The party opposing the use of an auction sale price as evidence of a property's value "has a very light burden to establish that a transaction was on its face an auction or a forced sale."   *Olentangy* at ¶ 43.   "Once that threshold is crossed," then the proponent of the auction sale price as evidence of the property's value "bears the burden to prove that the sale was nevertheless an arm's-length transaction between typically motivated parties."   *Id.*   In this case, it was undisputed that the subject property was sold at an absolute auction.   Thus, the Board of Education met its burden of establishing that the May 2012 sale was an auction sale.   Accordingly, a presumption arose that the May 2012 auction sale price was not evidence of the value of the subject property.   The burden then shifted to TMMC to prove that the May 2012 auction sale was an "arm's-length transaction between typically motivated parties."   *Id.*

{¶17} An arm's-length transaction is one that "'encompasses bidding and negotiation in the open market between a ready, willing and able buyer, and a ready,

willing and able seller, both being mentally competent, and neither acting under coercion.'" *NDHMD, Inc. v. Cuyahoga Cty. Bd. of Revision*, 8th Dist. Cuyahoga Nos. 101207 and 101300, 2015-Ohio-174, ¶ 24, quoting *Walters v. Knox Cty. Bd. of Revision*, 47 Ohio St.3d 23, 25, 546 N.E.2d 932 (1989). "A 'typically motivated' transaction is one in which the buyer and seller are 'pursuing their own financial interests.'" *NDHMD* at ¶ 25, quoting *Hilliard City Schools Bd. of Edn. v. Franklin Cty. Bd. of Revision*, 139 Ohio St.3d 1, 2014-Ohio-853, 9 N.E.3d 920, ¶ 31, citing *AEI Net Lease Income & Growth Fund v. Erie Cty. Bd. of Revision*, 119 Ohio St.3d 563, 2008-Ohio-5203, 895 N.E.2d 830, ¶ 25.

**{¶18}** In determining whether a transaction occurred at arm's length, the Ohio Supreme Court has identified three "relevant" factors: (1) "whether the sale was 'voluntary; i.e., without compulsion or duress,'" (2) "whether the sale '[took] place in an open market,'" and (3) "whether the buyer and seller 'act[ed] in their own self interest.'" *Olentangy* at ¶ 47, quoting *Walters* at 25.

**{¶19}** TMMC argues that the auction sale of the subject property was an arms-length transaction because (1) the property was generally advertised on the open market by means of a large sign that had been prominently placed on the property that was located near a busy intersection for more than six months; (2) the property was sold at a public auction along with several other properties; (3) "a room full of people" bid on the subject property; (4) there was no prior relationship between TMMC and the seller or auctioneer; and (5) there were no back taxes owed on the property.

{¶20} TMMC claims that the facts in this case are "nearly identical" to those in *Olentangy* — in which the Ohio Supreme Court upheld the BTA's finding that a public auction sale was voluntary and occurred at arm's length — and that this court should, therefore, "uphold the BOR's decision, just as the Court in *Olentangy* upheld the BTA's decision in favor of the taxpayer." In *Olentangy*, the taxpayer filed a complaint with the Delaware County BOR, seeking a reduction in the valuation of a parcel of real property that the Delaware County auditor had valued at $826,100 for tax year 2009 to the property's December 2008 auction sale price, $414,750. *Olentangy*, 141 Ohio St.3d 243, 2014-Ohio-4723, 23 N.E.3d 1086, at ¶ 6, 8-9. A division or affiliate of Countrywide Homes Loans ("Countrywide") had acquired the subject property, which included a single-family home, for $450,000 at a sheriff's sale pursuant to foreclosure in October 2007. *Id.* at ¶ 5. Several months later, Countrywide listed the property on the multiple listing service for a price of $479,000 and later reduced the price to $448,900. *Id.* When the property did not sell, Countrywide arranged for an auction of the property. *Id.* at ¶ 5-6. Abraham was the highest bidder and purchased the property at auction for $414,750. *Id.* at ¶ 6. After closing, he transferred the property to TaDa, a real estate holding company owned by Abraham and his wife. *Id.* at ¶ 7. At the hearing before the BOR, Abraham, who had no prior relationship with Countrywide or the auctioneer, testified that he had learned about the auction through advertisements on the internet and in newspapers several weeks before the auction date. *Id.* at ¶ 11. He testified that 75 to 85 people attended the auction in person and another 50 people participated online and that several

people bid on the property before he offered his last and highest bid of $414,750. *Id.* at ¶ 12. Countrywide, which had retained the right to reject the highest bid, accepted Abraham's bid and the closing occurred in December 2008. *Id.* at ¶ 12. After the hearing TaDa submitted a copy of the property's original MLS listing, the settlement contract between Abraham and Countrywide that confirmed Countrywide's authority to reject Abraham's bid and a real estate purchase addendum, which stated that Countrywide had acquired the property through foreclosure. *Id.* at ¶ 14. The Board of Education cross-examined Abraham but did not present its own witnesses at the hearing. *Id.* at ¶ 13.

{¶21} The BOR issued a decision reducing the 2009 tax year valuation to $414,750. *Id.* at ¶ 15. The Board of Education appealed, and the BTA affirmed, concluding, based on the record before it, that all elements of an arm's-length transaction were present for the 2008 sale and that the sale price at auction was, therefore, the "best evidence of [the] property's value." *Id.* at ¶ 19. The Ohio Supreme Court affirmed the decision of the BTA, reasoning as follows:

> On this record, the BTA could reasonably have concluded that Countrywide acted under duress and was not a typically motivated seller. But the record also contains sufficient evidence to support the BTA's contrary conclusion. As a result, we must defer to the BTA's finding that this particular auction sale was voluntary and occurred at arm's length. *See Satullo*, 111 Ohio St.3d 399, 2006-Ohio-5856, 856 N.E.2d 954, at ¶ 14.

*Olentangy* at ¶ 52. Thus, in *Olentangy*, the court determined — based on the evidence presented in that case — that the BTA could have reasonably concluded that the taxpayer had proven that that the 2008 auction sale was an arm's-length transaction, thereby rebutting the presumption that the auction sale price was not evidence of a property's

value, and or that the taxpayer had failed to rebut the presumption, i.e., that the auction sale was not an arm's-length transaction. Because the BTA determined that the sale was an arm's-length transaction, and its decision on this factual issue was entitled to deference by the court, the court affirmed the BTA's' decision.

{¶22} Ciocca's testimony demonstrates (1) that the auction sale in this case had certain "open-market elements," e.g., the auction was public, several people bid on the subject property and TMMC had no ties to the seller or auctioneer, *see Olentangy*, 141 Ohio St.3d 243, 2014-Ohio-4723, 23 N.E.3d 1086, at ¶ 51, citing *N. Royalton School Dist. Bd. of Edn. v. Cuyahoga Cty. Bd. of Revision*, 129 Ohio St.3d 172, 2011-Ohio-3092, 950 N.E.2d 955, ¶ 30, (2) that the sale was voluntary as to TMMC and (3) that TMMC acted in its own self interest in purchasing the property. However, in this case — unlike in *Olentangy* — there is very limited information in the record regarding the seller, the circumstances that led to the sale of the subject property or the seller's motivation in selling the subject property. Ciocca testified that he knew nothing about the seller. The only evidence in the record regarding the seller or the circumstances under which the seller sold the subject property is: (1) the identity of the seller; (2) Ciocca's testimony that the seller had owned the property since 1974 and that no back taxes were owed on the property at the time of the sale; and (3) that the property was offered for sale at auction "ABSOLUTE, REGARDLESS OF PRICE," i.e., with no minimum bid. Although Ciocca claimed the parties entered into a purchase agreement, the purchase agreement is not part of the record. There is no information as to why the seller sold the property at an absolute

auction or whether the sale was "voluntary" or under "compulsion or duress" from the seller's perspective.

**{¶23}** R.C. 5713.04 "'codifies the basic proposition that a sale must be voluntary from the standpoint of both *seller and buyer* in order to qualify as an arm's-length transaction.'" (Emphasis added.) *Bd. of Edn. of the Warrensville Hts. City School Dist.*, 145 Ohio St.3d 115, 2016-Ohio-78, 47 N.E.3d 144, at ¶ 18, quoting *Cincinnati School Dist. Bd. of Edn. v. Hamilton Cty. Bd. of Revision*, 127 Ohio St.3d 63, 2010-Ohio-4907, 936 N.E.2d 489, ¶ 19. Where, as here, a property is sold at "absolute auction," such that the seller is required to sell to the highest bidder, without a minimum bid, and where there is no indication that the seller had a right to refuse to sell or accept a bid, it does not appear that the seller is "typically motivated" such that it can be said that sale was an arm's-length transaction — at least in the absence of other evidence or information demonstrating the seller's motivation for such a sale. *See, e.g., Camaglia v. Cuyahoga Cty. Bd. of Revision*, BTA No. 2015-90, 2015 Ohio Tax LEXIS 4092, *3 (Nov. 17, 2015). Accordingly, on this record, we find that that the BTA acted reasonably and lawfully in concluding that TMMC presented insufficient evidence to rebut the presumption that the May 2012 auction sale was not an arm's-length transaction and that the auction sale price, therefore, could not be properly considered as evidence of the property's value under R.C. 5713.04.

**{¶24}** TMMC argues that the "*Bedford* rule" controls the result in this case and that under the *Bedford* rule, once TMMC "presented testimony [from Ciocca] on what TMMC paid for the property and his opinion of the property's value," that value "should have been

accepted over the [Fiscal Officer's] valuation of the property." TMMC also argues that because it "presented evidence on the value of the property" "negating the auditor's valuation" and the Board of Education did not offer any evidence of the property's actual value, the BTA was required to perform an "independent valuation" of the taxable value of the property and could not simply adopt the Fiscal Officer's original valuation of the property. Once again, we disagree.

{¶25} As the Ohio Supreme Court explained in *Columbus City Schools Bd. of Edn. v. Franklin Cty. Bd. of Revision,* 144 Ohio St.3d 324, 2015-Ohio-3633, 43 N.E.3d 387,

> the *Bedford* rule * * * states that the BTA may not, at the request of a board of education, reinstate the auditor's valuation when a BOR rejected that valuation based on competent evidence. *Worthington City Schools Bd. of Edn. v. Franklin Cty. Bd. of Revision*, 140 Ohio St.3d 248, 2014-Ohio-3620, 17 N.E.3d 537, ¶ 38-41, citing *Bedford Bd. of Edn. v. Cuyahoga Cty. Bd. of Revision,* 115 Ohio St.3d 449, 2007-Ohio-5237, 875 N.E.2d 913. The BTA can override the *Bedford* rule and reinstate the auditor's valuation when the BOR's decision to reject the auditor's valuation is completely unsupported in the record, *see Worthington City Schools* at ¶ 38, citing *Columbus City School Dist. Bd. of Edn. v. Franklin Cty. Bd. of Revision*, 90 Ohio St.3d 564, 567, 740 N.E.2d 276 (2001), or when the party challenging the BOR's action presents evidence that the auditor's valuation is more accurate than the BOR's.

*Columbus City Schools Bd. of Edn.* at ¶ 44.

{¶26} Thus, the "*Bedford* rule" applies only where a party presents competent evidence of a valuation different than the value assessed by the Fiscal Officer that the BOR relies upon in establishing a new property valuation. *See, e.g., Worthington City Schools Bd. of Edn.* at ¶ 32, 35, 38 ("[I]f a board of revision makes a valuation change that is completely unsupported in the record, the BTA may not affirm or adopt it. * * * [T]he

*Bedford* rule addresses circumstances in which the board of revision relies on specific and plausible evidence to reach a valuation different from that originally found by the auditor."). TMMC presented no such evidence in this case.

**{¶27}** As set forth above, with respect to the evidence TMMC presented regarding the auction sale price, the BTA concluded, following its independent review of the statutory transcript, that TMMC had failed to prove that the May 2012 auction sale was an arm's-length transaction by typically motivated parties and thus had failed to rebut the presumption under R.C. 5713.04 that the May 2012 auction sale price was not evidence of the property's value. As such, the May 2012 auction sale was not competent evidence of the property's value under R.C. 5713.04 and could not be relied upon in determining the total true value of the property.

**{¶28}** Aside from the evidence of the May 2012 auction sale of the subject property, the only other "evidence" TMMC submitted at the hearing were comparison lists of tax values for several neighboring properties it claimed were similar to the subject property. The BOR concluded at the hearing that this information was not competent, probative evidence of the tax value of the subject property and, therefore, did not rely on it in valuing the property. The BTA reached a similar conclusion. TMMC does not claim that the BOR or BTA erred in reaching this conclusion.

**{¶29}** Although TMMC asserts that Ciocca also "presented testimony" at the hearing regarding "his opinion of the property's value" and that the BOR relied on this "competent evidence" in determining the value of the property, Ciocca did not, in fact,

offer any owner opinion testimony at the hearing. Rather, he testified only as to the amount TMMC paid for the property at auction — $335,000 plus a 10% fee — and the maximum it would have been willing to pay for the property at the auction — i.e. that $375,000 "was going to be where we were going to stop." Ciocca explained that these numbers were not based on TMMC's (or his) opinion of what the property was worth, but rather, were based on the fact that "the three of us decided $125,000 apiece was significant" and that they were planning on paying cash for the property and "didn't want to put ourselves at risk." Ciocca admitted that, at the time of the auction, he "didn't know anything about the property" other than that it was vacant, that there were no back taxes owed on the property and that it "looked like a beautiful piece of land." *See Worthington City Schools Bd. of Edn.*, 140 Ohio St.3d 248, 2014-Ohio-3620, 17 N.E.3d 537, at ¶ 19 (discussing the "owner-opinion rule" and noting that it is based on the assumption that the owner "'possess[es] sufficient acquaintanceship with [the property]'" to estimate its value); quoting *Smith v. Padgett*, 32 Ohio St.3d 344, 347, 513 N.E.2d 737 (1987).

{¶30} Here, there is no evidence in the record upon which the BTA could have undertaken an independent assessment of the value of the subject property. "In the absence of probative evidence of a lower value," the BTA is "justified in fixing the value at the amount assessed by the county [fiscal officer]." *Salem Med. Arts & Dev. Corp. v. Columbiana Cty Bd. of Revision*, 82 Ohio St.3d 193, 195, 694 N.E.2d 1324 (1998); *Vandalia-Butler City School Dist. Bd. of Edn.*, 106 Ohio St.3d 157, 2005-Ohio-4385, 833 N.E.2d 271, at ¶ 12.

**{¶31}** Based on a thorough review of the record, we find that the BTA acted reasonably and lawfully in reversing the decision of the BOR and reinstating the valuation of the subject property assessed by the Fiscal Officer. Accordingly, we overrule TMMC's assignment of error.

**{¶32}** Judgment affirmed.

It is ordered that appellee recover from appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Board of Tax Appeals to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


_____
EILEEN A. GALLAGHER, JUDGE

KATHLEEN ANN KEOUGH, P.J., and
TIM McCORMACK, J., CONCUR